I should say, both in this case and in the next case, which is really the Semidoff case, Semidoff, even though we've allowed 20 minutes per side, per argument, obviously there's so much potential for redundancy and overlapping there. I think initially at the notice board I was trying to limit it so that time was being shared in counsel for Mr. Yuspov and Mr. Semidoff were entirely separate for the client. We allowed that. But that doesn't mean that we're going to open it up to two very redundant arguments. So it may be that we might ask you to wrap things up before the red light goes on if things appear to be getting redundant. May it please the Court. My name is Lawrence Rudnick and I represent Bexson v. Yuspov. There are, I think, a few differences between the two cases. Mr. Yuspov was granted both withholding under the statute and withholding under the Convention Against Torture by the Immigration Judge Durling and very able to pin the first gun. Yes, and that decision was reversed by the BIA for the Board of Immigration Appeals. Excuse my, so used to the terminology. The Board of Immigration Appeals reversed the Immigration Judge. The Immigration Judge determined and the Board affirmed that Mr. Yuspov would face torture if he were returned to Uzbekistan. The Immigration Judge also found, and the Board did not disturb, that his right for freedom would be threatened if he were returned to Uzbekistan. However, where the Board differed from the Immigration Judge is in finding that a mandatory exclusion applied. A mandatory exclusion under Section 241B3, B.I.V., which relates to whether or not there is a reasonable, there are reasonable grounds to believe that the alien is a danger to the security of the United States. And that mandatory bar also applies to the Convention Against Torture and thereby... And yet the government hasn't appealed the decision under the Convention Against Torture, correct? The government appealed the grant of both withholding and deferral of removal to the Board of Immigration Appeals and the Board affirmed... But to us today. No, there's... They do not. So where is Mr. Yusupov now? He was granted... A libibus corpus was granted approximately two months ago by Judge Jones of the Middle District. He is freed under supervision. And just to complete the information so that we have some of the facts here, essentially dealt with three. I mean, there were various persons living in the house. You had Yusupov, Samanov, and Zakharov. Correct. And was Zakharov got asylum? Correct. Under, I think, under... According to the immigration judge's footnote, under identical backpack. Okay. And he still hasn't... That was in the field? Or where are we... Because he's the one that the email apparently was addressed to. I think the email was addressed to Samanov, but I'll leave that to our filtered counsel. Focusing on Yusupov. The reason the Board reversed is because of the Attorney General's opinion in matter of I mean, the decision of the BIA just follows from the Attorney General's opinion, which I believe is deeply flawed. I think the Attorney General distorts the plain meaning of the statute. The government always argues for Chevron deference and deference under Aguirre, the Supreme Court immigration case. But deference, of course, would begin with the Chevron test is what does the statute say? And the statute says there's a reasonable, there has to be a determination of a reasonable, a reasonable belief... Is it your best argument under Chevron that... Don't you believe Aguirre, decided by a unanimous court, our highest court, in a unanimous opinion by Justice Kennedy, is the most persuasive and controlling case in the instance of matter? Well, it's highly distinguishable because we're not trying to do what the Ninth Circuit did in Aguirre v. Aguirre. Essentially, the Ninth Circuit rewrote the statute. Well, our argument is precisely the opposite. We believe the Attorney General rewrites the statute. The statute says reasonable grounds to believe there's a danger. And what the Attorney General does is he takes the word danger and distorts it out of any reasonable meaning. He says the danger means any, even any non-trivial... Well, a danger, I mean, it does kind of get into how many individuals can get ahead of opinion. Well, isn't the term ambiguous? Isn't the term ambiguous? We respect the term that it's not. This is a case that's very similar to the statutory interpretation that this court faced in the Auguste case. But if it's ambiguous, if it's ambiguous, Mr. Rudnick, isn't it entitled to Chevron deference? That would be correct. We submit it. It's not ambiguous. And our alternate argument is it's not a reasonable interpretation in any event. But a non-trivial danger is a danger. But I think what the Attorney General has done by taking danger and saying that any non-trivial level of danger... First of all, that's not what the statute says. The statute says danger. And he says, well, Congress intended any non-trivial because we have some executive order that has very dangerous... We have some executive order that's... But that is the basis of the Attorney General's decision. And we are... Can I just... Forget that argument. Forget that decision. You can certainly argue that a danger is any non-trivial danger. The non-trivial danger arguably is not a danger because the potential of it is so small that it's not really a danger. But once you get to the probability that it's no longer trivial, whatever the number that is, you've got a danger. You can certainly make that argument. That's what it says. I understand, Your Honor. But... Let me see if I can add on to that. Because I'm sure... Just one more. Well, we're mixing and matching overlapping questions. Maybe we do start with Judge Ackerman. You tried to look at the test that... Or how we... The test of what? How... What type of Chevron deference, if any, do we give in this case? Well... And then we'll come to the second issue. That remains to be seen. But I wanted to ask this. Under the Act... And I want a quote from it. And I'd like a response. Under the Immigration and Nationality Act, the Secretary of Homeland Security is charged with the enforcement and administration of the Act. And I want a quote. Provided, however, that determination and ruling by the Attorney General with respect to all questions of law shall be controlling and agree to the same effect. Your Honor, there's no question. There's an appropriate delegation of the Attorney General and that the Chevron deference applies. We don't argue the contrary. What we're saying is that it fails the Chevron test. That the Attorney General's opinion fails the Chevron test and that it violates the... You don't find it ambiguous? Well, let me respond to that by saying that we're urging this Court to follow the precedent of how the statutes are reviewed in Auguste. In Auguste, the question was whether or not... How do you interpret specific intent? And the Court said, well, we'll look to... This Court said, we'll look to the ordinary meaning in U.S. law. Here we have reasonable grounds to believe someone's in danger. Now, reasonable grounds to believe is a familiar part of U.S. law and it's generally been interpreted to mean something akin to probable cause. But is it a permissible interpretation? I'm not... I'm sure... I am sure that if we turned it around under certain circumstances, it could be considered a permissible interpretation. If the Attorney General, however, turns it around and says X, if that X is a permissible, if I may use that phrase, a permissible interpretation, then isn't that the ballgame? Well, that's the first issue, and that would certainly... If the Court concludes that what the Attorney General's opinion in AAH is a reasonable interpretation of the statute, then we lose our first argument. It's not our entire argument, but it certainly is the first argument. Isn't your best argument there just Cardozo-Fonseca? That says that when you... that courts interpret statutes... Correct. And this is three years after Chevron. This is not... So, I mean, one could make an argument that it's, in effect... that it's, in effect, an exception to Chevron, but what you're really, I guess, arguing is under Chevron Step 1 that the statute is clear on its face. Correct. This isn't a case like Aguirre-Garay. But the argument might be, and if you look at the concurring opinion of Justice Scalia in Cardozo-Fonseca, he was concerned that the Court was saying that as to statutory matters, that, in effect, what it was doing, it was eviscerating his word, Chevron, with respect to immigration. But the majority held, and nothing in Aguirre-Garay disturbs Cardozo-Fonseca. It's cited in the decision. What about Aguirre? Nothing in Cardozo-Fonseca is disturbed. In the Supreme Court, the majority said in Cardozo-Fonseca is that we use the tools of statutory construction and if the courts can determine what Congress's intent was, that that's the end. But there, the Supreme Court say in Aguirre-Garay, a case that followed Cardozo-Fonseca, let me quote, judicial deference to the executive branch is especially appropriate in the immigration context. End of quote. That's correct. Well, if it's correct, if it's correct, then what are we doing here? Well, you're saying deference doesn't mean amnication. Right, exactly. Deference is, if you look at the context, Justice Kennedy in Aguirre-Garay said that the reading of the Attorney General is the more natural reading. It's the proper reading rather than what the Ninth Circuit, what the Supreme Court said in Aguirre-Garay is, the Ninth Circuit, you went too far. You've read into the statute things that are not there. The natural reading is that of the Attorney General. We're also dealing with an area involving agency expertise, which I believe is Judge Ambrose's point. We're not having any agency expertise here. This is a commonly interpreted phrase in U.S. law. And the court is certainly able, through using standard tools of statute of construction, to ascertain that reasonable grounds to believe someone is a danger is not the same as reasonable grounds to believe that the alien may be a danger, which is what the Attorney General, that's what the Attorney General says. That may be stronger than the non-trivial focus, the is versus is. Yeah, it's very clear in a matter of age, the Attorney General says that his reading of the statute is that reasonable grounds for a reasonable person concludes that the alien may, and he's reading may in place of is, which is somewhat what the Ninth Circuit tried to do in Aguirre. We're on the opposite side of Aguirre here. We're on the side that says the statute should be read in the normal manner in which statutes are read. I look at the context here. We've got a set of immigration laws in which Congress adopts treaties and protocols in which say, do not return an individual. Fundamentally, our fundamental rule is we do not return individuals to countries where their life or freedom would be threatened or they would be tortured. And then there are exclusions, and it's our... If you look at the exclusions and you look at them in context, who do we exclude? Persecutors, serious criminals. Those are the grounds that are the one through three or above four that the government relies on. So reading the statute, you can see Congress's intent to limit the exclusions to individuals who are a serious problem for the asylum country. Maybe here, and we now get to where Judge McKee was heading. Working backwards, let's deal with, well, I guess security just before we get to danger. I take it you have no problem... Well, security doesn't just mean physical security. It could be economic security. It could. I don't think it's... No, I understand. That's what this case is about, but absolutely. As to danger, the Attorney General, in overruling the BIA in A.H., said that danger was anything, or argues here, that is non-trivial. Give me an example, and you argue that it's serious, based on Professor Groll-Madsen's and other people's statements with respect to the protocol that was initially adopted in 1951. Give me an example of something that is non-trivial but not serious. Well, let's say that, and if you took the facts of Yusupov, if he, let's say he spent hours watching things blow up and that there was a manual that what he was viewing... No, but danger to the security of the United States. Give me an example of something that's not trivial. I mean, I tried to give an example, but people kind of laughed at me, which was, if you remember, you're probably a little younger than I am, but in the 60s, there was a person who decided that he wanted to do something symbolic at the University of Wisconsin. It turns out the person was from Wilmington, Delaware. And he decided that he was going to blow up at least part of a science building, but he wanted to make sure that no one was hurt, so he was going to blow it up at 3 o'clock in the morning. Unfortunately, someone was studying at 3 o'clock in the morning and got killed. Assuming for the moment that no one got killed, that would certainly be non-trivial. And I thought, well, maybe there's an argument that it's not serious, and somebody said, wait a minute, blowing up a building's got to be serious. So I can't come up with an example. I would easily agree that that would be serious. I'm not sure what the correct adjective is. It's for the attorney general or the board to decide in the first instance. We are reviewing. Should there be an argument? I thought there shouldn't. I think it says a danger. Right, that's what it says. It is a danger. I think an interpretation by the attorney general or the board has to account for that language. It is a danger. Reasonable grounds to believe it is a danger. First, reasonable grounds, and second, that there's some danger. Non-trivial danger. Is that essentially the broadest interpretation of the term? Well, I would say it would be an extreme interpretation because the word is just danger. Congress didn't use any modifiers, and for the attorney general to go off and say that that means that the lowest form of danger is not supportive. Congress didn't say any non-trivial. They didn't say any danger. They could easily have said any danger. Did Congress express a clear intent for what is meant by danger? In the context, I believe that Congress has explained it. They did? Yeah, I think if you read the statute as a whole, reasonable danger to believe the alien is a reasonable danger, is a danger, that if you read that and you read it in the context of the entire provision of asylum law, looking at even Justice Scalia would say we certainly need to look at the full context, and the full context is this is a debarment. This is where we return someone to their home country to be tortured or their life for freedom is threatened. I can hardly imagine that Congress intended that that should occur based on any trigger level. If they did, then you would agree we have a situation shrouded in ambiguity and we have Chevron deference, should we not? Well, if it's ambiguous, then we go to the second step as to whether it's a reasonable interpretation. So we differ at this point as to what Congress intended. Is that correct? That would be correct, yes. All right. I think, Your Honor, if I can follow up, if you look at the statute as a whole, Congress gives an example of who is, per se, considered to be a danger, and that's terrorists. So you can see where they're heading with the statute. No, I'm referring to 1127, which refers you back to 1182. Yeah, Congress says, either you're a member of a terrorist organization or you're a terrorist, you are, per se, a reasonable danger to the United States. I mean, that's hard to quell with, but that's a very good example of what Congress intended looking at the statute as a whole. Well, let's look at reality. The 9-11 Commission, the 9-11 Commission, specifically pointed out that one of the greatest problems here, with respect to that tragedy, was their examination and finding that extremists had come here under student visas, said they were going to study, and instead, and I'll give you the name of the guy who did it, 3,000 people died. Now, with this, I'm not talking about my own rumination. I'm talking about the findings of the 9-11 Commission, which zeroed in on this particular problem. How can we ignore this, as judges who are committed not only to dispensing justice, but with respect to the inarguable proposition that the security of the United States is of first order? Well, it's certainly a consideration, and I don't deny it's an important one, but we also have other laws, and our fundamental commitment to not return individuals to countries where they'll be tortured or their life will be threatened. So that's also an important... He's been given deferral, has he not? That's correct, but that is a very temporary status.  Deferral is a lesser form of relief in which, at least temporarily, the individual is not returned to the home country. However, there are all kinds of exceptions to it, the biggest one being diplomatic assurances, and in this case, diplomatic assurances have been threatened. Mr. Yusupov, on the issuance of diplomatic assurances, without any further rights to judicial review of any kind, would be removed to Uzbekistan, one of the world's, and the record reflects, one of the world's leading torturing countries. There's no procedure built into that whereby, let's say that the government were to change circumstances, there's no burden they have to come back in, so regime is different, human rights are different, and these folks are saying that all of the torture... That's not part of it. There is an alternative under... Is that part of the procedure? It's not a required part of the procedure. It's certainly not required under diplomatic assurances. Literally, diplomatic assurances have been given, and Mr. Yusupov can be whisked out of the United States on a plane with no further rights. We don't get to come back to this court. When you say diplomatic assurances, what do you mean? There's a procedure by which the Department of State and the Attorney General and the Department of Homeland Security can agree that the government of Uzbekistan, via probably some diplomatic note, says, we'll take him back and we won't torture him. That's how tenuous the federal removal is, and why it's so important that we get to withhold him, which is mandatory. By the way, in Elias Zacharias, and we're talking about reversing the BIA, the court said, to reverse, and I quote, to reverse the BIA finding, we must find that the evidence not only supports that conclusion, but compels it. What is your answer? My answer is this court's two decisions interpret and follow in Dia and in Lusinga, and Judge McKee wrote the decision in Lusinga. While substantial evidence is a very deferential standard, again, it's not unlimited. It's not an unlimited standard. The court still has to look to see whether there are rational inferences that were taken from the facts and whether the evidence underweight wasn't given to certain evidence. But I think you'd be content with a remand for interfering with the appropriate standards. I certainly would, but alternatively, I think, as the immigration judge Durley, who heard all the evidence, said, there's really no evidence here. There's no there there. So there's no quantifiable evidence, quantifiable or persuasive evidence, that Yusupov is a danger to the United States. And the board reverses, mostly based on, they say principally because of two factors. One, his conviction under 1001 for lying to obtain a job in the United States. And secondly, because he's a student who came to the United States and didn't attend school. But that is explained fully in the record and credited by the immigration judge. I believe it's on page 258 of the joint transcript. Do you have time for one more question? Yeah, I'm sorry, Dan. I do have one question. Can I have one last one? Go ahead. You go ahead. The map, and I know the explanation is, well, that's easily obtained on the internet. I couldn't get it. I tried to find that map on the internet. Couldn't find it. I didn't put a lot of time into it. I put more time into it than I may have. Was he asked what he would do with a map of the state of New York? Well, it was never attributed to him in the record. He denied that. He denied it. He said, I never saw that. I never done that. And the immigration judge again credits his testimony. And again, the BIA has to enforce this as a matter of law because they're now under this clearly erroneous regime. Are you saying there's no evidence? The immigration judge, not me. No, I'm not talking about the IJ. I'm talking about the BIA. There's no evidence. BIA points to five reasons, the first three of which hardly withstand scrutiny, which is the extradition request and the Interpol warrant, which are totally discredited. They're basically the same thing. And they're totally discredited by the State Department. What about finding? By the opinion of POTS from the State Department says, those are pretextual. That's just getting back to torture. What about finding these speeches? I'm sorry? Finding these speeches, finding these video clips. The immigration judge also found, as a matter of fact. The pictures of the Pennsylvania State Barracks, every aspect of Pennsylvania State Police Barracks. Come on, we've got to look at this commonsensibly. But those were never connected. We have to look at the record. Those were never connected to Mr. Yusupov. What kind of connection? The only evidence that was submitted was evidence taken from a computer that was shared by three individuals. And Yusupov testified credibly that he did not view the Pennsylvania State Police. And the other issue is raised by the board. And again, they principally say they relied on not the computer evidence, which the immigration judge thought was the heart of the government's case. The board turns around and says, well, maybe not. What we're relying on is the 1001 conviction and the fact that he didn't attend school. Well, the attend school thing, I think, is a factor we can take out because Yusupov credibly explained why he didn't go to school. It wasn't a pretext to get here and blow anything up. How much evidence is needed in cases of this sort? A high level, medium level, or low level? I'll quote the immigration judge. It has to be some quantifiable or persuasive evidence. Let me ask you that. Or direct evidence that you're not in your brain? Well, I think it would have to be some direct evidence. That's what you argued, didn't you? Well, some, and I believe we argued that. What is your legal basis for that assertion? Well, I would say there would have to be direct evidence if there was a compelling case of circumstantial evidence. But there's neither here. There's neither direct evidence nor persuasive evidence. And that's the opinion of the immigration judge who heard the case and heard the testimony. The BIA found that your client went through a marriage which in their judgment was not bona fide. Is that correct? I'm sorry, that's not my case. That's the ex-case. I'm sorry, I apologize. Let me pick up on that if I may. It's obvious that the government doesn't have to show beyond a reasonable doubt. It's obvious that the government doesn't have to show clear and convincing. Correct. One can make a pretty good argument that the government does not have to show preponderance of the evidence. No. The government says probable cause. And the question is, is probable cause what you would need in order to make an arrest? Or is, back to the last case we had, in effect, not so much probable cause but rather a suspicion that a reasonable, articulable suspicion that criminal activity, or in this case prescribed activity, is afoot? I think the term reasonable belief more naturally refers to the arrest rather than the stop. I know the government argues to the contrary, but the statute does not say reasonable suspicion. It says reasonable belief. And reasonable belief, but it need not be 50% in order to... I don't think probable cause has been interpreted to always, certainly always require... So, just in closing, if you could pick up on the problem, it would seem that the difference between you and the government may not be as much as I initially perceived when I looked at the groups. I'm not sure I'm happy with what the government has to say. All right. Thank you. Mr. Potter? Good morning, and may it please the court. Jonathan Potter on behalf of the Attorney General. Can I just start with, just to make sure I get some of the facts straight. You had three people in a, among others, in this home, residence. That's correct, Your Honor. And one of them, and I guess they had a shared computer, and it seems as if they had that. Is that correct? That's correct, Your Honor. They all paid, put money in for that computer. That's correct. To buy it or to maintain the online service? To buy it. It's not clear about maintaining the online service, but it's clear that to buy it, they all... It wasn't broadband, I assume. That's correct, Your Honor. And just to get one fact out with respect to the computer, the memo or the email that was sent that mentions the word jihad, which means, I think, many things to many people, but was that sent to Mr. Zakharov, I thought it was, to him rather than to Sametov? Yes, Your Honor. Let me clarify. Originally, it was thought it went to Mr. Sametov. Later, it was determined that it went to Mr. Zakharov. Mr. Zakharov was granted asylum, and then when things moved to reopen his case, he fled to Canada. He's currently in Canada right now, according to all the information I have. Okay. And then, so, Agent Alexa, is that his name? That's correct, Your Honor. He came into this matter. If bells went off for Agent Alexa, why didn't he do a further investigation? That's my concern, too. The nature of the investigations. I mean, he went up to a point and then just stopped as if. . . Well, Your Honor, I don't think that that's a correct statement. What did he do then? Joint task force investigations are always ongoing, so. . . But what did he testify at the hearing? What did he do prior to his testimony at the hearing in order to look at this concern that existed with regard to someone? You had somebody who was among the people that we have today sending money back to his brother but hadn't noted it. There was this e-mail. There was the person's coming here on student visas and not going to school. Things that could raise suspicions. That's correct, Your Honor. What did he do in order to investigate those suspicions? One of the things that was appropriate in this case was to put all the individuals in INS detention. Of course, we didn't get to Zakharov in time to do that. We did have Mr. Samanov. We do have Mr. Samanov in INS detention. Mr. Yusupov has been released pursuant to conditions, which are GPS monitoring I still believe is the appropriate and possibly moving to a bracelet. One thing I want to clarify in this case... What did Agent Alexa do to investigate at the time that this all started? There were interviews. Mostly Mr. Alexa didn't do the primary interviews in this case. The FBI did, Your Honor. Mr. Alexa is a DHS agent with the Joint Terrorism Task Force. So what did the FBI slash DHS do? They investigated in this case, Your Honor. They took the computer. The computer took a considerable amount of time to decipher. They took that computer in. At the time that Mr. Alexa testified, there was still some deciphering of the computer that was ongoing. Did they check with the school to see whether or not the school here had received tuition payments from Uzbekistan? And even whether or not that was the agreed-upon procedure, Your Honor, still would pay Uzbekistan to have it forwarded? I don't believe that's part of the record, but I can speak from understanding and belief those investigations were conducted as well. In this case... Excuse me, Your Honor. No, no. You finish. Go ahead. Okay. In this case, Mr. Yusupov's case, he never attended school. Mr. Saminov did attend school for a very, very short period of time. And he, along with several other people that attended school with him, Mr. Saminov, and this is, once again, we're going to, I think, mix cases throughout this argument. But I thought Yusupov didn't attend because he was concerned because the tuition that was paid in Uzbekistan never got to the school. That was his claim, Your Honor. I cannot speak specifically on the investigation. I know they checked on that. I can't say whether... Okay. Because that would have been pretty easy to confirm or deny. That's right, Your Honor. But you have to understand the investigation at the time of this hearing was ongoing. Mr. Potter. Yes, Your Honor. I gave Mr. Rudnick a hard time in light of his brief, which stated, I want you to comment on this. He said, I want you to comment on that. Your Honor, I disagree that that is the standard. The government must submit evidence that gives reasonable grounds to believe that there is a non-trivial, that the individual presents a non-trivial danger to the security of the United States. You're saying evidence that the person is a, and then you're saying non-trivial. It presents a non-trivial danger to the security of the United States. Okay. But the verb is important. You're saying another evidence to suggest that to establish the person is a near non-trivial danger. That's what you're suggesting. That's correct. And I would defer, since I don't have it right in front of me, I would defer to what the Attorney General said, because Well, he didn't say it. He said it made no difference. Exactly. It made no difference. It may present a non-trivial danger to the security of the United States, Your Honor. That's correct. But isn't that a big difference than is? Well, Your Honor, I think the problem could be, is different than I think the problem the Attorney General correctly looked at is what is a danger? And as you said, Your Honor, it's hard to figure out what a non-trivial danger is. And you cannot even quantify It doesn't even question that the Attorney General what may be, anything greater than zero, we could argue, may be a danger. And I would submit it's almost impossible to get a level of danger down to zero. Almost, you know, you can pick a citizen off the street and ask yourself, what is the danger that this person, totally sight unseen, may be a danger? If it's greater than zero, you can say, well, yeah, the person may be a danger. You don't have to think about it. It's got to be more than the hypothetical more than zero may be a danger. And I think you have to look at that on a case-by-case basis, Your Honor. And you look at, you're not seeing somebody in this court today we're not arguing about somebody that was picked up and there's no other information that indicates that they have connections to groups that may be a danger to the United States. There's no other indication. I mean, I do not have videos like this on my computer. I don't have... No, that's right. You may have that from mailing. The question we're asking you is the standard that we set here that applies not only to this case but other cases that come down the pike. And what I was trying to do with Mr. Rundick is to say, well, maybe there's not as much difference between you and the government as initially meets the eye. But where there does seem to be a difference is on two points in the A.H. decision, which is actually an attorney general decision on behalf of the BIA. The reasonable grounds for regarding standard, which is now as reasonable grounds to believe standard, is satisfied if there is information that would permit a reasonable person to believe that the alien may pose a danger to the national security. It actually is supposed to be national security of the United States. And what Judge McKee is asking you about is when you look at that and compare that to the statute, there are reasonable grounds to believe that the alien is a danger to the security of the United States. What's the difference? There would seem to be, or one could argue, that there is a difference. Well, Your Honor, I think, once again, if you look at establishing a person as a danger is an almost... almost... depending on the circumstances, would be a very difficult thing to say. This person is definitely going to be a danger. Muhammad Atta, before September 11th, determining he would actually be a danger to the United States would probably have been an impossible task. No, I'm not. I'm not at all sure about that. I'm not at all sure about that. Forget the personalities. Let's just... Is there any indication that the BIA based its decision on utilizing the word permit or may? Your Honor, there is not. In fact, I think the BIA in this case determined that both Mr. Saminoff and Yusupov, the evidence was sufficient that they are a danger to the security of the United States. I thought the BIA cited A.H. in there. They did, Your Honor. But I think in their credal paragraph, they didn't say may, but it could be wrong. I think Mr. Yusupov's case, I'm not sure. Maybe the good argument for you would be that it need not be, when you say is a danger, the person who makes that conclusion need not believe by a preponderance of evidence. And you used the words probable cause. That's correct, Your Honor. Let's say this is something less than that. But the question is, is there a difference? We know that in Fourth Amendment, there is a difference between probable cause and a terry-stop reasonable articulable suspicion. The question is, where do you come down? If the word is a danger, is that probable cause in terms of probable cause the way we normally understand it in the Fourth Amendment, or is it a terry-stop reasonable articulable suspicion? It's more of the latter, Your Honor, reasonable articulable suspicion. Now, the Attorney General in A.H. does cite 2 cases talking about... Because? Because if you look at what is reasonable, we're asking if there are reasonable grounds to be suspicious of somebody. We're asking, in this case, we'll look at it. First of all, the Interpol notice and the Uzbekistan warrant. Well, the Uzbekistan warrant standing alone is a reasonable grounds to be suspicious. However, if you put that on top of the Interpol notice... Isn't that the same? What generates the Interpol notice? It's got to be the same thing. No, Your Honor, they're not... What generates the Interpol notice is the Uzbekistan government. But there is a vetting process by the Interpol, which makes those rise in level of seriousness more than just the Uzbekistan government. But isn't what happened here is one of the persons was sent back and was tortured and then later said that he had given their names to the Uzbek authorities? That's not really clear, Your Honor, because that was a testimony of both petitions in this case. But if you look at the acts that happened and some of the things from 1997 on, everybody that was a believer in Nazaroth who was the imam for these individuals was believed to be part of the Islamic movement for Uzbekistan, which is a... Well, okay, imam Nazaroth, is he listed on any terrorist list of the United States? I thought he, in 98, left Uzbekistan. He was concerned about having his sermons at the mosque censored by the government and went underground in 1998. But is there... All I can say on the record is he seemed to be alive. Your Honor, I would disagree with that. I don't know... What evidence is there on the record? Educate me. From what my understanding, he is now currently has asylum in, I believe, Sweden. I know it's a Scandinavian country. Who's in Sweden? Nazaroth, Your Honor. And I want to clarify something else regarding Samanov and Yusupov as far as... There's been some discussion here about us sending back... But before that, what was the evidence that's in the record that imam Nazaroth is perceived by the United States to be a threat to its security? I don't know if there's anything in the record that specifically links. There's information that links both these individuals to extremist organizations. The Uzbek Islamic Movement for Uzbekistan, that's one. But the record is that the government knew of no terrorist groups operating in Uzbekistan. Am I wrong about that? That's... If that is stated by an officer, it is contradicted by some of the record. Where there is the Islamic Movement for Uzbekistan is in the record, I think, in both records. What does the country report say for Uzbekistan? The country report does not mention... So the State Department, at least, does not think that they're saying... does not know of or is referring to any terrorist activity going on in Uzbekistan. That doesn't necessarily mean DHS. Well, at the time that the country report was prepared, that's correct, Your Honor. I think the country report does not refer to any terrorist activity in that country. I just remind the court that that is a bit dated. Some of the other later information indicates that there is, in fact, terrorist activity in Uzbekistan. Now, you said you wanted to put in some additional information pertaining to Yusupov and Sametov. Yes, Your Honor, I do. I think all the parties are aware of what's going on as far as what's going on in Judge Jones's court. And to say that Mr. Sametov or Mr. Yusupov will be removed to Uzbekistan anytime soon is just not true because the United States has made clear to Judge Jones that we are not accepting any assurances from the Uzbek government, and we will not do so until the Uzbek government changes. And that has been made very clear to all the parties. So the threat of Mr. Yusupov or Mr. Sametov going back to Uzbekistan at this time is just not there.  But that doesn't end the problem, does it? That does not, Your Honor. And these gentlemen have been here since 1999 on a non-immigrant status. That's correct. They came in as students, Your Honor. Mr. Yusupov came here, said he was going to school in Santa Monica, California. Never even got there. That's correct. Never got there. That's correct. Wasn't supposed to work. Worked. Correct? Correct, Your Honor. And he also, to get around that not working, he also claimed he was a United States citizen and was convicted for that. For closets by design, correct? That's correct, Your Honor. Why didn't you move, by the way, if he claimed he was a United States citizen and was not, why didn't you move to remove him for that reason? Your Honor, I can't speak to that. That's a question that you'd have to ask the counsel that handled this case specifically. That is an option. If this case would be remanded, that would be an option. I would advise the government to pursue as well, to be honest. Here you have, I mean, the big picture is you've got this 51 protocol, which became something that came out in 67 as well, I guess, in effect, restated. We adopted it in 68. We did some amendments under the Refugee Act of 80, and then it was amended again in 1996. There's a balancing act. There's a balance between the rights of the individual and then the security rights of the state and the need not to have individuals eligible for withholding of removal if they're a threat to the security. How do you propose, what is it in the way you interpret 241 today that takes into account the individual rights not to be tortured if that person, or persecuted if that person is sent back? I think these two cases illustrate exactly what takes into account that, and that's deferral of removal under torture protection. Neither of these individuals are going back to his back stand. Maybe I'm incorrect, but if you are a threat to the security of the United States, are you not also ineligible, not only for withholding of removal, but for cap protection? You're not ineligible for cap protection. You are not. These two individuals, we look at it as cap protection. No matter what, you will get cap protection if you're going to be tortured. Then why was the IJ's decision appealed by you to the BIA with respect to cap? Because the idea was at that time that the Uzbekistan government, what this person would be subjected to was not torture, but was actually prosecution for criminal activities. I don't know if we would stand by that today with more knowledge of the Uzbek government, and I don't want to speak for the agency in saying that they would or would not. But I do know that neither one of these individuals is going back to Uzbekistan under Uzbekistan's current regime or model. And I do know that the United States is seeking what happens in both deferral of removal under the torture protection and deferral of removal under withholding is we seek to find a third country that will take these individuals. And that process is ongoing today to try to find third countries to take both Mr. Sandler and Mr. Yusufov. Now, how do you try to get around a situation where the third country becomes a proxy for the reference with an agent? And, Your Honor, this isn't part of the record, but I can maybe educate the court on how this is, because I'm part of the team that does this with the State Department, Department of Homeland Security, and some other agencies, including the FBI, is there is intense internal discussions regarding where to send people, where we can't. And the idea of a proxy is always considered in determining whether to send somebody to Egypt or to some other country. We look to see if there's any possibility that that would just serve as a proxy if we sent somebody to Kazakhstan. This has never come up, but it's just purely an example. Send somebody to Kazakhstan. Tomorrow, that person will end up in Uzbekistan under their control. We do look at those kind of things. That's it. You've answered a big part of my question today. Does Mr. Powell appreciate that? The issue here seems to me is managing risk. I thought it was allotting risk, but it's not really allotting the risk. In a way, it's balancing risk and managing the risk. Given the history of the Convention on Refugees, it's clear the U.S. is saying that as a matter of official governmental policy and law, we will not send anyone back to a country, even though they're here illegally. If doing that... Don't hold me to these verbs or the adjectives. If doing that, we'll cause them to be tortured. But, as I saw in one of the legislative histories here, there's also a recognition that allowing someone to stay in this country, giving them that guarantee, may subject the U.S., may endanger the U.S.'s own security. When that's the case, we're not going to decide we're not going to expel them. We will expel them, but the test is set fairly high because we know the risk of torture. Now, we're arguing about how high it is and the level of certainty for establishing that the prisoner will be tortured over the risk of the U.S., and all that fits into the subsection before calculus. But when you add into that the deferral of removal under CAT, which frankly I didn't fully appreciate until you elucidated this and Mr. Reddick referred to it, it seems to me that unless we're just really into litigating this, that there is a way to resolve this thing with whatever assurances that you can give Mr. Reddick, and I'm assuming the same may or may not be true for Ms. Farrell, although we'll hear from her in a second, to provide some reasonable guarantees that their clients will not be sent back to Uzbekistan under the circumstances where sending them back there is going to cause them to be killed or have fingernails pulled out, those kinds of things, which is what their concern is. Their concern is they don't want to go back and have to deal with this government. I did do a quick consult with the Greek Google last week and boy, I've seen some bad countries in these immigration cases, but Uzbekistan looks like something that Boris Karloff might want to consider being Prime Minister of. It's a scary place. Theoretically, if they wanted to, they could go to Sweden, be near Mr. Nemiroff, correct? Theoretically, yes, Your Honor. One of the problems with that is the country, there has to be what we call an accepting country. That means a country, we have to fully advise the foreign country of, and I'm out of time. If you want me to finish answering the question, I'm happy to. We have to ask the accepting country to take the individual and fully advise the country of the background of that individual. Now, that's probably better addressed by somebody from the State Department. I'm here on behalf of the Attorney General. I'm not quite sure the entire workings of those diplomatic channels, and I know there's a lot of national security issues regarding releasing information, and I'm not even privy to all the things the State Department does regarding these individuals, but they do coordinate with the accepting country, and they have to get an accepting country. It isn't just as simple as saying, okay, we don't want you anymore, Sweden will take you, because Sweden has to say, we will take them. That's a matter of concern for the State Department and how that works, and I don't want to speak for them as far as your question, Your Honor, about the differences between the two sides. I don't think there's a great difference on the fate of either one of these gentlemen as far as they're going back to Uzbekistan. I cannot speak for the part of the State Department, but I know the Attorney General currently has no plans and foresees no date in the near or far future where either one of these gentlemen will go back to Uzbekistan, and we would want them to be removed there. As to a third country, those investigations are ongoing, and we're working through the State Department and through, interestingly enough, DHS and the FBI also have contacts in these countries where they can assist us, and those efforts are ongoing. We just haven't been able to find a country yet. Okay. Thank you. Thank you very much, Mr. Potter. Mr. Bonaghi, you just had a few minutes here. I'll be very brief. First, to answer Judge Ambrose's question, the BIA in this case used the May standard. On page 3 of the BIA decision, which is page 6 of the joint appendix attached to our brief, about halfway down the page, they clearly state, any non-trivial level of danger to national security, and the record contains a reasonable portion of the belief that the respondent may pose a danger to national security. Mr. Potter thought that in the holding, they were not relying upon May, but I thought that he used the May standard. It is my reading of very much the holding. Two other things briefly. First of all, I can repent to the court and could present documents from the litigation in front of Judge Jones. The Department of Homeland Security specifically represented to Judge Jones that they were seeking diplomatic assurances to remove my client to Uzbekistan. Subsequently, the Department of State came in and said, well, not now. But that's not now. Maybe tomorrow. Who knows? So there's no guarantee there. The other issue, Judge, I wanted to respond to what Judge Ambrose asked me, what is our differences? One of the differences, first of all, on reasonable grounds to believe, and we believe it's akin to the arrest probable cause. That's the natural reading of that term. That's how Black's Law Dictionary refers to it. Well, why would they say it? Because the Congress clearly knows that probable cause is a little phrase that uses the term of art in law. Why wouldn't they say that? Unless there are probable cause, there is probable cause to believe that the alien is or may be. I think they use the term reasonable grounds to believe, which has generally been interpreted to be probable cause. I think they used it with that understanding. I mean, certainly a lot stronger influence than the Attorney General's influence from the word danger. I think this is far more consistent with the precept that Congress legislates with the idea that these words have special meaning. That's one significant difference. In the matter of AH, the Attorney General said, I will remand to the BIA the issue of whether there are reasonable grounds for regarding respondent as a danger to the security of the United States. He did not italicize permit or may to indicate any particular... The BIA did not italicize or permit the word permit or may to indicate any particular reliance on them. What is your answer to that? I have to assume that the Board of Immigration Appeals quoted quoting the particular part of matter of AH that says may, that they meant may and they understood may. That's the only conclusion I can reach from having used the word may. Thank you. They used in AH Adams v. Baker. In that line of case, it seems to be a very different concern. I addressed that in reply briefly. That's a different consideration. Although the respect of Mr. Potter, I don't think that the Attorney General even used Adams in the way that the government argues. Basically, what the Attorney General cites Adams for is the kind of evidence that can be considered rather than the quantity or quality evidence or the level of danger. And Adams deals with whether you can use newspaper articles and journals and things. That's essentially how it is. There's no balance. He's out of the country. He's safe in Northern Ireland. Thank you. Thank you very much. Thank you very much. A very difficult case. It's the next one. We'll take this one. I think it's the end of the advisement. Seven offers to the Attorney General.